

# In the United States Court of Federal Claims

No. 18-569L

(Filed: July 19, 2018)

FILED

JUL 1 9 2018

U.S. COURT OF
FEDERAL CLAIMS

**(NOT TO BE PUBLISHED)**

```
*********************************  )
                                   )
ROBERT SWIFT ARROW DANIEL          )
ROSE DIGADATLADV AYANULI,          )
                                   )
              Plaintiff,           )
                                   )
       v.                          )
                                   )
UNITED STATES,                     )
                                   )
              Defendant.           )
                                   )
*********************************
```

Robert Swift Arrow Daniel Rose Digadatladv Ayanuli, *pro se*, Tellico Plains, Tennessee.

Antonia R. Soares, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With her on the motion were Chad A. Readler, Acting Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Elizabeth M. Hosford, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Senior Judge.

Plaintiff, Robert Swift Arrow Daniel Rose Digadatladv Ayanuli, asserts claims on behalf of himself, his son, and other individuals, as well as an entity called the Cherokee Nation of Indians.  He alleges takings of land, identity theft, "bad men" claims, tort and criminal claims, and human and religious rights violations stemming from the actions of various local, state, and federal officials.  Pending before the court is the government's motion to dismiss for lack of subject matter jurisdiction, Def.'s Mot. to Dismiss Pl.'s . . . Compl. ("Def.'s Mot."), ECF No. 5, which motion the court grants for the reasons stated.

## BACKGROUND

Mr. Rose[1] identifies himself as the traditionally appointed chief of the Cherokee Nation of Indians, which entity he concedes is not recognized by the Bureau of Indian Affairs. Compl. at 11-13. He does maintain, however, that the Cherokee Nation of Indians is "on the list of Treaty Nations at the [United States Department of State]." Compl. at 11. He also claims that the Cherokee Nation of Indians is a treaty successor to the Treaty of 1730, which is a treaty entered into between the "nation of the Cherrokees" and Great Britain, 46 years before the Declaration of Independence. Compl. at 2-3 (emphasis omitted). As such, Mr. Rose claims the Cherokee Nation of Indians has "[o]riginal [s]overeignty" as a result of the "preexisting and super[s]eding [t]reaty agreement." Compl. at 3. Accordingly, Mr. Rose seeks to assert claims on behalf of himself, his son, the Cherokee Nation of Indians, and various "Cherokee Treaty Indians." Compl. at 1, 5, 13. Mr. Rose makes reference to an attorney of record, but he is appearing *pro se*. Compl. at 14 & Attach. 1 at 1. Only Mr. Rose's signature appears on the complaint. Compl. at 13.

Mr. Rose asserts various human and religious rights violations as well as treaty violations under assorted bad men clauses. Compl. at 4-9.[2] His claims rely on three treaties: the "Treaty of 1730," the "Treaty of 1791," and the "Treaty of 1819." Compl. at 1, 2, 20-26.[3] The numerous allegations stem from what appear to be incidents with local, state, and federal law enforcement and courts. One such incident stemmed from court proceedings in North Carolina where Mr. Rose alleges that human and religious rights violations occurred when his eagle feathers were crushed, his religious medicine bag was dumped out, and he was unlawfully imprisoned when held in contempt of court for speaking his native Cherokee language. Compl. at 4. Another such

---

[1] The court refers to the plaintiff as "Mr. Rose." "Digadatladv Ayanuli" appears to be a title or honorific held by Mr. Rose. *See* Compl. at 14, 15.

[2] Bad men clauses appeared in nine treaties executed between the United States and Native American tribes in 1868. *See* Note, *A Bad Man Is Hard to Find*, 127 Harv. L. Rev. 2521, 2525 (2014). Bad men clauses typically contained language to the following effect: "If bad men among the whites . . . shall commit any wrong upon the person or property of the Indians, the United States will . . . proceed at once to . . . reimburse the injured person for the loss sustained." *Id.* at 2525-26. Although bad men claims have been infrequently litigated, this court has exercised jurisdiction over such claims. *See id.* at 2528-29; *see also Elk v. United States*, 87 Fed. Cl. 70, 72, 96 (2009); *Hebah v. United States*, 192 Ct. Cl. 785, 792 (1970).

[3] The "Treaty of 1730" appears to refer to a treaty made between Great Britain and the Cherokees regarding trade and relations between the English Colonies and the Cherokee tribe. *See* Cherokee Treaty of Alliance and Commerce, Sept. 30, 1730, 33 Consol. T.S. 277. The "Treaty of 1791" refers to a treaty between the United States and the Cherokee tribe regarding "Peace and Friendship." *See* Treaty with the Cherokee, July 2, 1791, 7 Stat. 39. Mr. Rose refers specifically to Article IX of the "Treaty of 1791," which is titled "No citizen to settle on Indian lands." *Id.* The "Treaty of 1819" refers to a treaty concerning the cession of Cherokee lands to the United States. *See* Treaty with the Cherokee, Feb. 27, 1819, 7 Stat. 195.

incident involved North Carolina law enforcement officers who allegedly trespassed, imprisoned three "Treaty Indians," and seized gaming equipment. Compl. at 5. Mr. Rose similarly claims that an encounter with Tennessee law enforcement officers resulted in unlawful imprisonment and the theft of several items, including a Cherokee passport, driver's license, license plate, and vehicle. Compl. at 6. He also alleges that park rangers in the Great Smoky Mountains National Park threatened five "Treaty Indians." Compl. at 8. Further, Mr. Rose asserts that an unnamed party threatened him, racially profiled and traumatized his son, and forced a "Treaty Indian" to pay a fine. Compl. at 5, 6. Mr. Rose raises comparable claims on behalf of other "Treaty Indian[s]" who were held in contempt of court and fined, again claiming trespass, unlawful imprisonment, judicial misconduct, and unlawful seizure of money. Compl. at 4-5, 7.

In addition to the various allegations of treaty violations, Mr. Rose raises assorted Fifth Amendment takings claims. He contends that the Treaty of 1834, which conveyed land from the Cherokees to the United States, is invalid because the "Cherokee 'Tribe' of Indians . . . never got the consent of [the] Cherokee [N]ation of Indians to sign the Treaty." Compl. at 1 (emphasis omitted); *see* Treaty with the Cherokee, Dec. 19, 1834, arts. 1-2, 7 Stat. 478. He alleges that the Cherokee Nation of Indians is owed the "[r]eturn of lands . . . within the lawful jurisdiction of Cherokee Country by the Treaty of 1791 Article IX" and the "Treaty of 1819." Compl. at 2. He also seeks the "return of 1000 acres stolen from [the] Cherokee Nation of Indians." Compl. at 2. Further, he asserts that land in the Great Smoky Mountains National Park was taken in an "act of eminent domain" in violation of several treaties. Compl. at 12. Finally, he claims that the States of Georgia and Tennessee owe the Cherokee Nation of Indians payments for the use of highways and roads constructed in "Cherokee Country," which payments were allegedly due twenty years after the completion of said highways and roads. Compl. at 2. Finally, Mr. Rose alleges identity theft by the State of Tennessee for its use of the "Royal Crown title Cherokee name 'Tennessee,'" Compl. at 3, and by the United States for its use of the name "America." Compl. at 1, 11. This latter use allegedly violates the Treaty of 1730 between the "Cherrokees in America" and Great Britain. Compl. at 11.

As a remedy, Mr. Rose requests $600,000 in damages for each of the 29 alleged treaty violations, as well as "29 live eagles of [his] choosing from various aviaries or ZOOs" for use in traditional religious ceremonies. Compl. at 10-11. He also seeks transfer of 1000 acres of land to the Cherokee Nation of Indians and "surrender and transfer of operations of TDOT and GDOT to Cherokee Nation of Indians." Compl. at 10 (emphasis omitted). He seeks additional damages of $90,000,000 to remedy the alleged identity theft occurring from use of the name "Tennessee," as well as a 10% annual royalty payment to the Cherokee Nation of Indians for the State's continued use of the name. Compl. at 10. He seeks the same amount from the United States for the use of the name "America." Compl. at 11. Finally, as a remedy for the alleged payments owed to the Cherokee Nation of Indians for the use of roads, highways, and turnpikes, Mr. Rose seeks "all [park ranger offices] and [national forest lands] from Great Tellico to S[ugarland]"[4] be transferred to the Cherokee Nation of Indians. Compl. at 10.

---

[4]Mr. Rose appears to be referring to lands within the Great Smoky Mountains National Park, extending from Tellico Plains, Tennessee to the Sugarlands Visitor Center near Gatlinburg, Tennessee.

## STANDARDS FOR DECISION

Jurisdiction must be established as a threshold matter before the court may proceed to the merits of a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). When jurisdiction is challenged, the plaintiff bears the burden of proving subject matter jurisdiction. *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010). While a *pro se* litigant is afforded some leniency as to legal formalities, this does not relieve him or her from meeting their jurisdictional burden. *Kelley v. Secretary, United States Dep't of Labor*, 812 F.2d 1378, 1380 (Fed. Cir. 1987).

The Tucker Act provides this court with jurisdiction to entertain "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is a jurisdictional statute that creates no substantive right to money damages. *In re United States*, 463 F.3d 1328, 1333 (Fed. Cir. 2006). Thus, to establish jurisdiction, a plaintiff is required to "point to a substantive right to money damages against the United States." *Hamlet v. United States*, 63 F.3d 1097, 1101 (Fed. Cir. 1995) (citing *United States v. Testan*, 424 U.S. 392, 398 (1976)).

Similarly, the Indian Tucker Act confers jurisdiction upon this court to hear claims presented by Native American entities or groups for claims accruing after August 13, 1946, that would otherwise be cognizable in this court if the claimant were not an Indian tribe. *See* 28 U.S.C. § 1505; *United States v. Navajo Nation*, 556 U.S. 287, 289-90 (2009). The Indian Tucker Act applies to "tribe[s], band[s], or other identifiable group[s] of American Indians," and not to individual tribal members. *See* 28 U.S.C. § 1505; *see also Tsosie v. United States*, 825 F.2d 393, 401 (Fed. Cir. 1987) ("[A]n Indian tribe can sue on a treaty under 28 U.S.C. § 1505 and an individual Indian can sue under 28 U.S.C. § 1491 . . . ."). Substantive rights are not created by the Indian Tucker Act, so plaintiffs must identify a separate source of law that establishes specific duties and allege that the government has failed to perform those duties. *Hopi Tribe v. United States*, 782 F.3d 662, 666 (Fed. Cir. 2015) (citing *Navajo Nation*, 556 U.S. at 290).

A complaint raising claims that are outside this court's jurisdiction must be dismissed, for the court in that circumstance lacks adjudicative power. RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also Gray v. United States*, 69 Fed. Cl. 95, 98 (2005) (citing *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868) ("Without jurisdiction the court cannot proceed at all in any cause.")); *Thoen v. United States*, 765 F.2d 1110, 1116 (Fed. Cir. 1985)).

## ANALYSIS

This court does not have jurisdiction over the claims Mr. Rose, as a *pro se* litigant, brings on behalf of the Cherokee Nation of Indians and its members. The Rules of the Court of Federal Claims provide that "[a]n individual who is not an attorney may represent oneself or a member

4

of one's immediate family, but may not represent a corporation, an entity, or any other person in any proceeding before this court." RCFC 83.1(a)(3). The term "immediate family members" is defined as "parents, spouse, children, and siblings." *Fast Horse v. United States*, 101 Fed. Cl. 544, 548 (2011) (quoting Black's Law Dictionary 273 (8th ed. 2004)) (internal citations omitted).

That the Cherokee Nation of Indians is not a federally recognized tribe, *see, e.g.*, Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 81 Fed. Reg. 5019-02, 5020 (Jan. 29, 2016) (listing federally recognized tribes), engenders further jurisdictional constraints. Representation by a *pro se* litigant of a federally non-acknowledged tribe is not permitted. *See Williams v. United States*, 482 Fed. Appx. 580, 582 (Fed. Cir. 2012) (holding that a *pro* se litigant was barred from asserting claims on behalf of an Indian tribe that was not federally recognized.); *Michael v. United States*, No. 14-757L, 2014 WL 5395877, at \*2 (Fed. Cl. Oct. 23, 2014) ("*Pro se* representation [of an alleged Indian group] is prohibited under RCFC 83.1(a)(3) because the group has not been federally acknowledged as a sovereign Indian tribe."). Because Mr. Rose is not an attorney, he may not bring claims on behalf of the Cherokee Nation of Indians or its members.

Additionally, the Cherokee Nation of Indians, as such, is not party to any of the treaties cited by Mr. Rose. As a nonparty to the treaties, neither Mr. Rose nor the Cherokee Nation of Indians would have a cause of action to enforce said treaties. *See Medellin v. Texas*, 552 U.S. 491, 505 (2008) ("A treaty . . . 'depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it.'") (quoting *Head Money Cases*, 112 U.S. 580, 598 (1884)); *Medellin*, 552 U.S. at 506 & n.3 ("[I]nternational agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.") (quoting *Restatement (Third) of Foreign Relations Law of the United States* § 907, cmt. a (Am. Law Inst. 1986)).

Moreover, Mr. Rose's invocation of claims based on bad men clauses fails to state a cause of action on which relief could be granted because the treaties he relies on either do not involve the United States as a party or do not contain such clauses. Although the Federal Circuit has held that Tucker Act jurisdiction extends to certain claims under bad men provisions, *Tsosie*, 825 F.2d at 399-400, Mr. Rose has failed to allege facts sufficient to state a claim under such provisions, *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[P]laintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions . . . .") (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The United States was not a party to the Treaty of 1730—indeed, that treaty was concluded decades before the United States Government was formed. *See* Cherokee Treaty of Alliance and Commerce, Sept. 30, 1730, 33 Consol. T.S. 277; Compl. at 2-3. Additionally, neither the Treaty of 1791 nor the Treaty of 1819 contain bad men provisions. *See* Treaty with the Cherokee, July 2, 1791, 7 Stat. 39, Compl. at 20-23; Treaty with the Cherokee, Feb. 27, 1819, 7 Stat. 195, Compl. at 24-26.

To the extent Mr. Rose alleges takings of land under the Fifth Amendment, those claims are time-barred. This court has jurisdiction over takings claims because the Takings Clause is a money-mandating constitutional provision. *Jan's Helicopter Serv., Inc. v. Federal Aviation*

5

*Admin.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008) ("[T]he Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction"). Nonetheless, Mr. Rose's takings claim, even under a charitable reading, would have accrued in the 1700s or 1800s and consequently are far outside this court's six-year statute of limitations. 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). Further, even if Mr. Rose were permitted as a *pro se* litigant to bring claims on behalf of the Cherokee Nation of Indians, those claims too would be untimely under the Indian Tucker Act's coextensive limitations period.[5] Additionally, this court does not possess jurisdiction to award equitable relief in the form of transferring land to the Cherokee Nation of Indians. *See Williams*, 2011 WL 3891124, at *1, *4 (holding that requests to return ancestral lands by a *pro se* Indian plaintiff were equitable in nature and thus outside this court's jurisdiction).

Further, this court does not have jurisdiction to entertain Mr. Rose's claims arising out of the alleged conduct of local, state, and federal government officials. This court may exercise jurisdiction only over "claim[s] against the United States," not claims against private or state actors. 28 U.S.C. § 1491(a)(1); *Moore v. Public Defender's Office*, 76 Fed. Cl. 617, 620 (2007) ("When a plaintiff's complaint names private parties, or local, county, or state agencies, rather than federal agencies, this court has no jurisdiction to hear those allegations."); *see also Fullard v. United States*, 78 Fed. Cl. 294, 300 (2007) ("This court does not have jurisdiction to hear claims against individual federal government officials, prosecutors, or judges."). Thus, Mr. Rose's claims involving parties other than the United States are outside this court's jurisdiction and must be dismissed.

Correspondingly, claims sounding in tort are outside the scope of this court's jurisdiction. *See* 28 U.S.C. § 1491(a)(1); *Shearin v. United States*, 992 F.2d 1195, 1197 (Fed. Cir. 1993). Mr. Rose asserts claims of identity theft, trespass, and the infliction of emotional distress upon his son. Compl. at 4-8, 10-11. To the extent these claims sound in tort, this court does not possess jurisdiction to hear them. *See Cycenas v. United States*, 120 Fed. Cl. 485, 498 (2015) ("To the extent plaintiff's complaint asserts claims of . . . identity theft . . . and trespass, those claims sound in tort, or allege criminal conduct . . . [and] this court lacks jurisdiction to adjudicate those claims."); *Mastrolia v. United States*, 91 Fed. Cl. 369, 381 (2010) ("[C]laims for pain and suffering, emotional distress, and mental anguish sound in tort.") (citation omitted). As such, these claims must be dismissed.

---

[5]The Indian Tucker Act only grants this court jurisdiction to hear claims "against the United States accruing *after* August 13, 1946." 28 U.S.C. § 1505 (emphasis added). Claims which accrued before that date were required to be brought before the now no-longer-extant Indian Claims Commission within five years of its formation. *See Fast Horse*, 101 Fed. Cl. at 547; *Williams v. United States*, 2011 WL 3891124 at *3 (Fed. Cl. Sept. 2, 2011) ("[J]urisdiction over treaty disputes between the United States and Indians is expressly limited only to those disputes that have accrued after 1946 . . . [and plaintiff's claims] are based upon treaties signed between 1786 and 1837"). Thus, independent of the untimeliness of the claims, Mr. Rose's treaty claims would be outside this court's jurisdiction under the Indian Tucker Act.

Nor can this court exercise jurisdiction over alleged criminal, human rights, or religious rights violations. To the extent Mr. Rose alleges theft or trespass as criminal violations, *see* 18 U.S.C. §§ 1163, 1167, this court does not possess jurisdiction over these claims. *See* 28 U.S.C. 1491(a); *Fernandez de Iglesias v. United States*, 96 Fed. Cl. 352, 363 (2010) ("[T]he Court of Federal Claims lacks jurisdiction over criminal claims.") (citation omitted). Further, this court does not have jurisdiction to hear claims of human or religious rights violations that are not premised on a money-mandating provision of law. *Sanders v. United States*, 34 Fed. Cl. 75, 80 (1995) ("This court does not have jurisdiction to entertain general civil rights claims that are not based upon an appropriate money-mandating provision."); *cf. Marlin v. United States*, 63 Fed. Cl. 475, 476 (2005) ("[This] [c]ourt does not have jurisdiction to consider civil rights claims brought pursuant to 42 U.S.C. §§ 1981, 1983, or 1985."). Mr. Rose has not identified any money-mandating provisions of law that would plausibly relate to the rights violations he alleges, therefore, this court may not entertain those claims.

In short, Mr. Rose's complaint alleges a variety of claims over which this court does not have jurisdiction. As a *pro se* litigant, Mr. Rose may not bring claims on behalf of the Cherokee Nation of Indians or others outside his immediate family. While this court has jurisdiction over claims based on bad men clauses, the treaties Mr. Rose cites either do not contain such clauses or the United States is not a party to them. Additionally, the alleged takings of land based on treaties from the 1700s and 1800s are outside the statute of limitations for such claims. Further, this court does not possess jurisdiction to entertain claims against local, state, or federal government officials, or claims sounding in tort or criminal law. Finally, Mr. Rose has failed to cite any money-mandating provision of law that would cover the human and religious rights violations he alleges. Because Mr. Rose has failed to plead any facts that would give rise to jurisdiction in this court, his complaint must be dismissed.

## CONCLUSION

For the reasons stated, defendant's motion to dismiss is GRANTED. The clerk shall enter judgment in accord with this disposition.

No costs.

It is so **ORDERED**.

Charles F. Lettow
Senior Judge